**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>**Plaintiff,**<br><br>**v.**<br><br>**TWENTY-THREE (23) PIT BULL-TYPE DOGS AND ANY OFFSPRING,**<br>**Defendant Property.** | : | **CASE NO.: 5:26-CV-375** |

**UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE**

COMES NOW, Plaintiff, the United States of America, by and through its attorney, the United States Attorney for the Middle District of Georgia, brings this Complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

***Nature of the Action***

1. This is a civil action *in rem* brought to enforce 7 U.S.C. § 2156(e) for the forfeiture of twenty-three (23) pit bull-type dogs that were involved in a violation of the Animal Fighting Venture Prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156 (hereinafter "Defendants *in rem*"). This action also seeks the forfeiture of any offspring of these seized Defendants *in rem*.

***The Defendants in Rem***

2. The Defendants *in rem* are twenty-three (23) pit bull-type dogs seized from 365 Andrews Road, Knoxville, Crawford County, Georgia 31050, including any offspring born subsequent to the seizure of the adult Defendants *in rem*.

3. The Defendants *in rem* are more specifically described as follows:[1]

a. USM-2143 – a brown, female pit bull-type dog;

b. USM-2144 – a tan, male pit bull-type dog;

c. USM-2145 – a black, female pit bull-type dog;

d. USM-2146 – a black, male pit bull-type dog;

e. USM-2147 – a black, female pit bull-type dog;

f. USM-2148 – a black, female pit bull-type dog;

g. USM-2149 – a red/tan, male pit bull-type puppy;

h. USM-2150 – a red, male pit bull-type dog;

i. USM-2151 – a black and white, female pit bull-type dog;

j. USM-2152 – a black and white, male pit bull-type puppy;

k. USM-2153 – a brown, female pit bull-type dog;

l. USM-2154 – a black, female pit bull-type dog;

m. USM-2155 – a black, female pit bull-type dog;

n. USM-2156 – a black and white, female pit bull-type dog;

o. USM-2157 – a black, female pit bull-type puppy;

[1] The U.S. Marshals Service assigns each dog an identification number upon intake, such as USM ####.

p. USM-2158 – a black, male pit bull-type dog;

q. USM-2159 – a brindle, male pit bull-type dog;

r. USM-2160 – a black, female pit bull-type puppy;[2]

s. USM-2161 – a black, female pit bull-type dog;

t. USM-2162 – a black, female pit bull-type puppy;

u. USM-2163 – a black and white, female pit bull-type dog;

v. USM-2164 – a black, female pit bull-type puppy;

w. USM-2165 – a red/brown, female pit bull-type dog.[3]

4. The Defendants *in rem* referenced in Paragraph 3 were seized on or about June 24, 2026, from the yard of the above-referenced residence located in Knoxville, Georgia, pursuant to a federal search warrant. They are currently in the custody of the U.S. Marshals Service and being cared for by a U.S. Marshals Service contractor.

5. The Defendants *in rem* are subject to forfeiture to the United States pursuant to the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.*, as animals involved in violations of the federal Animal Fighting Venture Prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156.

---

[2] Following the seizure, USM-2160 tested positive for parvovirus and was humanely euthanized while in U.S. Marshals Service custody to avoid prolonged suffering.

[3] At the time of this Complaint, seven (7) puppies were born to USM-2165 while in U.S. Marshals Service custody. They are as follows: USM-2165A (a brown, male pit bull-type puppy); USM-2165B (a black, female pit bull-type puppy); USM-2165C (a black, male pit bull-type puppy); USM-2165D (a brown, female pit bull-type puppy); USM-2165E (a black, male pit bull-type puppy); USM-2165F (a tan, male pit bull-type puppy); and USM-2165G (a black, male pit bull-type puppy).

### *Known Potential Claimant*

6. The person known to the United States who may claim an interest in the Defendants *in rem* is Robert James Hester. The United States will provide notice of this action to this possible claimant.

### *Jurisdiction and Venue*

7. Plaintiff brings this action *in rem* in its own right to enforce the forfeiture of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(e). This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355. Upon the filing of this Complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

8. This Court has *in rem* jurisdiction over the Defendants *in rem* under 28 U.S.C. § 1355(b) and 28 U.S.C. § 1395.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1355(b)(1), because acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395, because the action accrued in this District, and the Defendants *in rem* were seized in Knoxville, Crawford County, Georgia, which is situated within the Middle District of Georgia.

### *Statutory Basis For Forfeiture*

10. The Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment."

7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

11. The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(e). Animals "seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id*. In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id*.

12. The statute also contemplates forfeiture of seized live animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

7 U.S.C. § 2156(e). The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business." *Id*.

13. As explained below, the Defendants *in rem* are animals involved in violation(s) of 7 U.S.C. § 2156, or represent offspring, and are therefore subject to forfeiture to the United States of America pursuant to 7 U.S.C. § 2156(e).

***Background***

14. In the United States, dog fighting ventures typically involve "pit bull type" dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dog fight occurs when two (2) dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one (1) dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

15. Because of their conditioning and training, adult dogs used in animal fighting ventures are housed separately from other dogs – on chains or in pens and cages – so that they will not hurt or kill other dogs when the handler is absent. Heavy metal chains are often used for restraining dogs involved in dog fighting so that they may develop neck strength, which is vital during a dog fight. Additionally, dog fighters typically possess a variety of training apparatuses to condition dogs for a fight. These apparatuses include, but are not limited to treadmills, slat mills, spring poles, flirt poles, and jenny mills. Treadmills, slat mills, and jenny mills are types of running mills that have been modified to attach to a dog via harness so as to require the dog to run for extended periods of time, thus increasing a dog's stamina and cardiovascular endurance. Spring poles and flirt poles consist of ropes or chains (and a spring coil, in the case of a spring pole), attached to a vertical structure (such as a pole, tree, or residence),

terminating in an animal hide or toy and are used to build jaw strength and increase aggression as a dog repeatedly jumps and latches onto the hanging animal hide or toy.

16. Dog fighters often take steps to house fighting dogs away from public view, such as by placing them at the back of property lines, inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

17. Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three (3) or five (5) fights, respectively. Dog fighters track their dogs' fight records through "pedigrees." The pedigree of a fighting dog shows the dog's name, with reference to the dog fighting "kennel," as well as breeding lineage going back multiple generations, with references to the number of fights won by that dog and its predecessors. Pedigrees are important in the dog fighting industry because they allow dog fighters to maintain information on whether a particular "bloodline" or breeding combination resulted in desired fighting traits. Dog fighters maintain contact with other dog fighters around the country and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting animals.

18. Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through

fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the "bloodline" of these dogs for fighting purposes. Dogs that lose fights or fail to show "gameness" are often killed in cruel, torturous, and inhumane ways as punishment.

19. Dog fighters also routinely test and evaluate their dogs to determine which among them exhibit aggressive behavior, sometimes even testing against the dog fighter's other dogs. The most common way that a dog fighter tests a particular dog to ascertain whether the dog is "game" is to "roll" the dog. A roll is a dog fight conducted for purposes of game-testing rather than for wagering. Roll fights generally last from five (5) to fifteen (15) minutes, at which point the handlers usually stop the fight. However, roll fights can result in serious injury or death to one (1) or both dogs.

20. It is a common practice for those involved in training and exhibiting fighting dogs to possess large numbers of dogs at one time. This practice is employed for several reasons. First, dog fighters maintain a stock of dogs at different weights and of both sexes; this is because, in dog fights, dogs are generally matched against other dogs to within a pound of the same weight and of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight and sex meets the requirements for a match solicited by an opponent. Second, dog fighters also maintain multiple dogs at a time to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting "bloodline." Third, dog fighters possess many dogs for the simple fact that many often die or are mortally wounded during fights;

therefore, possessing multiple dogs at a time also increases the prospects of owning a dog who will become a Champion or Grand Champion.

21. Dog fighters commonly use a "rape stand" or "rape rack," a device used to immobilize and forcibly breed a female dog when the female dog is too aggressive to mate naturally. Such devices are strong evidence of dog fighting because legitimate breeders would not choose to breed a dog who was too aggressive to mate naturally.

22. Dog fights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match" or "show." The owners or handlers agree upon: (1) the sex and weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

23. It can be challenging for dog fighters to not only find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, but also agrees to the proposed wager. For that reason, dog fighters rely heavily on each other and on extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often call out a weight to known dog fighters in several states to increase their odds of finding a match. Calling out

a weight is typically done by telephone, text message, e-mail, or other electronic communication. It is an integral practice without which many dog fights would not occur.

24. Once a dog fighter locates an opponent and agrees to the terms, the match is "hooked," or set up. The dog then undergoes a conditioning process that dog handlers refer to as a "keep." A keep is typically conducted for six (6) to eight (8) weeks before the scheduled match and may involve a training program including but not limited to: dog treadmills used to run and exercise the dogs away from public view; weighted chains and pulling devices used to increase the dog's strength and stamina; and the use of devices such as spring poles and flirt poles to build jaw strength and increase aggression.

25. Dog fighters typically do not start setting up matches for a dog until the dog reaches at least eighteen (18) months to two (2) years of age. Until then, dog fighters may test the dog out by rolling it or having the dog participate in short fights to assess the dog's demeanor. Thus, it is common for dog fighters to possess multiple young pit bull-type dogs who are in the process of being trained to fight.

26. Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dog fights are commonly found on the face and front legs, as well as on hind ends and thighs.

27. Dog fighters also frequently possess and use veterinary drugs and devices, some of which are not legal to possess without a license to practice veterinary medicine, so that they may attempt to repair the injuries of any surviving dogs after a fight without drawing the scrutiny of a licensed veterinarian. Dog fighters use legal and illegal drugs to increase the strength and stamina of their fighting dogs.

28. Dog fighters who maintain successful or high-potential fighting dogs do so for long periods of time so that they can continue to profit from those dogs in future dog fights or from selling offspring or breeding rights. The more fights a dog wins, the higher that dog's value for either offspring, breeding, or sale to another dog fighter.

***Factual Allegations***

29. At all times relevant to this Complaint, Robert James Hester ("Hester") was a resident of 365 Andrews Road, Knoxville, Crawford County, Georgia 31050 ("365 Andrews Road").

30. In 2023, the Crawford County Sheriff's Office ("CCSO") responded to 365 Andrews Road in reference to a complaint of property damage. Hester reported that one of his dogs was missing from the property, and he suspected it was stolen. Hester advised the deputy that the dog was a Machobuck (a descendant of Grand Champion Machobuck, a highly decorated game-bred dog famous in the early 2000s), and due to its pedigree was worth $4,500.00. While the deputy was at 365 Andrews Road responding to the complaint, the dog, showing significant scarring and wounds on the head and face, appeared on the property. The deputy took photographs and documented the dog's injuries in the incident report.

31. In 2024, following an altercation between one of two convicted felons Hester was employing and housing on the property and a juvenile neighbor, the CCSO executed a search warrant at 365 Andrews Road. In addition to observing stolen weapons, drugs, and drug paraphernalia, the deputies also reported that there were malnourished dogs at 365 Andrews Road.

32. In May 2026, the CCSO contacted the Georgia Department of Agriculture regarding dog fighting activity in Crawford County and provided information regarding the incidents described in Paragraphs 30 and 31, as well as Hester's extensive criminal record, which includes thirty-nine (39) arrest cycles between 1979 and May 18, 2026. In addition to other convictions, all of which were prosecuted in the state of Florida, Hester has been convicted of felony animal fighting, baiting, and cruelty; a violent assault; and a firearms weapon charge. Most relevantly, Hester was convicted in 2006 of the offenses of felony fighting and baiting animals and felony cruelty to animals. In 2009, he was convicted of the offense of misdemeanor cruelty to animals.

33. The CCSO arranged for Special Agent Sean Fitzgerald ("SA Fitzgerald") with the Georgia Department of Agriculture to speak to an anonymous source of information ("SOI") connected to Hester. On May 26, 2026, the SOI told SA Fitzgerald that there were approximately forty (40) adult and juvenile dogs being housed at 365 Andrews Road, some in kennels, and some tethered to trees and other structures across the property. The SOI overheard Hester talk about transporting dogs from the property to Florida and Mississippi for the purposes of dog fighting, as well as discussing the weight ranges required for fighting eligibility. The SOI observed Hester selling dogs to people, including a man from Florida who came to 365 Andrews Road to purchase a dog. It is the SOI's understanding that Hester employs a man from Dooly County, Georgia, to maintain the property and tend to the dogs. The SOI has observed dogs at Hester's property that were severely wounded and scarred from fighting. According to the SOI, Hester keeps large amounts of dog food on pallets covered with tarps and uses the

treadmills to condition fighting dogs. In addition to the dogs, the SOI told law enforcement that Hester housed multiple fighting roosters at 365 Andrews Road and bragged that they cost $5,000.00 each. Additionally, the SOI provided information about suspicion of Hester's involvement with drug selling and distribution, and had observed Hester in possession of large amounts of U.S. currency.

34. On May 29, 2026, pursuant to a state search warrant, aerial surveillance of 365 Andrews Road revealed approximately ten (10) pit bull-type dogs, some with visible injuries and/or scarring, occupying chain spots in the yard; a pit bull-type dog inside of a whelping pen with suspected puppies; numerous dog collars; multiple bags of dog food; and a treadmill. Agents suspected that there were additional pit bull-type dogs and other evidence of animal fighting, but were unable to make these observations due to a dense tree canopy over the property. A "chain spot" refers to the individual outdoor area in which a fighting dog is kept and restrained by a heavy chain, delineated by the area accessible to the dog. As the dog moves around, the restricted area of motion and the weight of the chain dragging across the ground result in a circular patch of bare dirt with a radius approximating the chain's length. A whelping pen is an enclosed structure within which a pregnant female dog gives birth to and nurses puppies.

35. On June 24, 2026, a federal search warrant was executed at 365 Andrews Road related to the interstate dog fighting investigation.

36. During the execution of the federal search warrant for 365 Andrews Road, agents observed that several of the Defendants *in rem* exhibited scarring, wounds, sores, or other injuries, including:

a. USM-2143 (including scarring on face, neck, right front and back legs);

b. USM-2144 (including scarring on neck, both hips, left front leg and shoulder, right front foot, and tail);

c. USM-2145 (including scarring on ears and face; missing portion of left ear; entirely missing all four (4) incisors; all other teeth worn down to the gumline);

d. USM-2146 (including scarring on face, head, neck, front right paw, rear right paw, rear left paw, rear left leg, and front left leg, as well as missing upper part of left lip and missing top right incisor);

e. USM-2148 (including scarring on face, both front legs, and left rear leg);

f. USM-2149 (including scarring on front left leg and rear right leg);

g. USM-2150 (including missing lower left incisor; scarring on face, head, neck, both front legs, and rear right leg);

h. USM-2151 (including scarring across face, both front legs, and back left leg);

i. USM-2153 (including scarring on top of head, neck, and front left leg);

j. USM-2156 (including scarring on neck);

k. USM-2157 (including scarring on head, ears, neck, rear left leg, left flank, and front right leg);

l. USM-2158 (including scarring on all legs);

m. USM-2162 (including scarring on face, snout, both front legs, and between shoulders);

n. USM-2163 (including scarring on front right leg, right shoulder, and rump); and

o. USM-2164 (including scarring on both front legs and right ear).

37. It is not uncommon for dogs possessed for the purpose of participation in a dog fighting venture to lack scarring and wounds indicative of dog fighting activities. A dog may lack scarring for a variety of reasons, including its fighting prowess, because it has yet to be fought (either because it is too young or because its handler had yet to find an appropriate match for the dog's sex and weight), or because it is being used exclusively for breeding purposes.

38. Twenty-two (22) dogs (USM-2143, USM-2144, USM-2145, USM-2146, USM-2147, USM-2148, USM-2149, USM-2150, USM-2151, USM-2152, USM-2153, USM-2154, USM-2156, USM-2157, USM-2158, USM-2159, USM-2160, USM-2161, USM-2162, USM-2163, USM-2164, and USM-2165) tested positive for hookworm, a parasite that, if left untreated, can cause severe, life-threatening health issues for dogs. Three (3) dogs (USM-2150, USM-2151, and USM-2153) tested positive for babesia, a tick-borne parasite that, if left untreated, can cause severe, life-threatening health issues for dogs. Two (2) dogs (USM-2147 and USM-2155) tested positive for roundworm, a parasite, that if left untreated, can cause severe, potentially life-threatening health issues for dogs. Eleven (11) dogs (USM-2144, USM-2146, USM-2149, USM-2154, USM-2155, USM-2156, USM-

2157, USM-2158, USM-2159, USM-2162, USM-2165) tested positive for cystoisospora (coccidia), a parasite, which can cause severe, life-threatening health issues, particularly in puppies and immunocompromised dogs.

39. Two (2) dogs (USM-2157 and USM-2160) tested positive for parvovirus, a highly contagious, life-threatening virus that has no direct cure. USM-2157 responded well to treatment and made a full recovery. USM-2160 tested positive after the seizure and initial intake paperwork was completed. Unfortunately, USM-2160 did not respond to the treatment, and humane euthanasia was requested to prevent unnecessary suffering.

40. Five (5) dogs (USM-2149, USM-2156, USM-2159, USM-2161, and USM-2162) had an active tick infestation.

41. All twenty-three (23) dogs seized were intact; it is common among dogs involved in an animal fighting operation to not be spayed or neutered so that they can be bred to continue the dog fighting bloodline.

42. Consistent with dogs possessed and/or trained for participation in an animal fighting venture, almost all of the Defendants *in rem* were found to be restrained or housed separately. Twenty (20) of the twenty-three (23) dogs were restrained separately from the others with heavy chains that were either tied around a tree, staked into the ground, or tied to a heavy metal object (car axle). For each dog, the immediate area consisted of a dirt circle covered in feces with makeshift shelter (in the form of a plastic crate, barrel, or kennel or a plywood a-frame or box). USM-2154 and USM-2155 were found housed together in an enclosed whelping pen, which was covered in feces.

USM-2157 was found in another enclosed pen, which was also covered with feces. USM-2150 was wearing a weighted collar. Weighted collars are used to build a dog's neck strength, which is vital during dog fights.

43. None of the dogs had access to food. Some dogs lacked access to water, and the water provided to the remaining dogs appeared dirty and not suitable for drinking.

44. In sum, the condition in which the Defendants *in rem* were found was not consistent with that of pet dogs of a comparable age.

45. Additionally, a number of items commonly associated with an illegal dog fighting operation were observed at and/or seized from 365 Andrews Road. For example:

a. A flirt pole with an animal toy, which dog fighters use to condition the dogs to build stamina and muscle;

b. A spring pole with a leash, which dog fighters use to condition the dogs to build stamina and muscle;

c. A rape/breeding stand;

d. Veterinary supplies. Dog fighters often attempt to mend the injuries of their dogs rather than seek veterinary attention, which may raise suspicion regarding the cause of injuries. Thus, it is common to find veterinary supplies where dogs involved in dog fighting are being kept. Dog fighters often keep and administer medications intended for use on other species. Agents seized the following from 365 Andrews Road:

i. Miscellaneous dog medicine, steroids, and vitamins; and

ii. Two (2) types of canine dewormer.

e. A weighted dog harness/collar; and

f. A treadmill and a slat mill, which dog fighters use to condition the dogs to build stamina and muscle.

46. Agents also observed two (2) roosters, housed separately in individual cages, which are believed to be the two fighting roosters Hester described to the SOI.

***Conclusion***

47. Based on the foregoing, probable cause exists to believe that the Defendants *in rem* were involved in, in any manner or part, to commit and/or to facilitate the commission of the aforementioned offense, and are subject to forfeiture pursuant to 7 U.S.C. § 2156(e) (animals involved in a violation of the Animal Welfare Act), and includes any offspring produced prior to the conclusion of this case.

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the Defendants *in rem*; that due notice be given to all parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* forfeited to the United States of America for disposition according to law; the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(e) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted on this 28th day of August, 2026.

WILLIAM R. KEYES
UNITED STATES ATTORNEY

BY: *__/s/ Julius J. Jefferson__*
JULIUS J. JEFFERSON
Texas Bar Number 24087797
Assistant United States Attorney
United States Attorney's Office
Middle District of Georgia
Post Office Box 1702
Macon, Georgia 31202
Telephone: (478) 752-3511
Email: julius.jefferson@usdoj.gov